The clerk could call our final case of the morning, but the next one got bumped. 1632-92, People v. Jose Penaloza. If counsel who are going to argue could approach and tell us who you are and who you represent. Good morning, Your Honors. Assistant State's Attorney Sarah McGann on behalf of the People. Good morning. Sean Collins-Stapleton on behalf of Jose Penaloza. Okay, 15 minutes per side and save some time for rebuttal. And if we unduly harass you, which happens occasionally, we might give you a little wiggle room. Proceed. Jose Penaloza's right to the effective assistance of counsel. Keep your voice up. That's for recording that amplification. Make sure everybody can hear. Sure. Jose Penaloza's right to the effective assistance of counsel was violated, Your Honors, by counsel's mishandling of gunshot residue evidence, gang evidence, hearsay evidence, as well as by counsel's significant unprofessional conduct for the jury. Now, Strickland v. Washington is violated when defense counsel's ineffectiveness causes a breakdown in the adversarial process. In Jose's case, there were multiple breakdowns. And the breakdown started before trial when defense counsel failed to appreciate that the discovery showed that a co-defendant tested positive for gunshot residue. This was such an egregious error that the trial court, when he learned of it and learned that defense counsel not only had not been aware of the positive test, but had failed to bring in witnesses to establish the chain of custody for this evidence, that he removed counsel from active participation in the case before the jury. Indeed, this was a significant loss for Jose. This evidence had the potential to change the entire evidentiary picture for the case. Given the defendant's testimony at trial, how can you make that argument? Well, again, Your Honor, we have to go back in time and think what would an able defense counsel have done with a positive test for another defendant? Well, wait a minute. He's testifying under oath as to what happened. Yes, but again, Your Honor. The jury heard the evidence. The jury heard the evidence, but the jury did not hear that evidence, and counsel Are you saying that the evidence would have been, his testimony would have been different? Perhaps he wouldn't have testified. We just simply don't know what counsel, if he had known He did testify. So we know what he says happened. But again, looking back at this case, if counsel had known of this gunshot residue test, before trial, and knew that a co-defendant had a positive result, it could have changed his entire outlook of the case. It could have strengthened his position in plea bargaining. The State argued that the defense counsel was just chasing its own theory of the case. Are you saying that if the defense counsel had known about the co-defendant's GSR testing positive, that the beginning part of this case, the initial theory of the case, would have been significantly different? It could have been, certainly. And again, it could have strengthened his position in plea bargaining, for example. And I think it's also important to note that the State office was There's nothing in the record to support that plea bargaining argument. Right? Well, there was an offer Aren't we kind of in a position now where you're sort of stuck with what the defendant's testimony is as to how this transaction occurred? Well, Your Honor, again Which is not that he did anything, but that another individual threw the gun out the window and it accidentally discharged. And this testimony that you're talking about would have completely contradicted what the defendant says happened in this case. But again, it could have changed how counsel prepared for the case and how he prepared Jose for the case. Meaning we wouldn't put him on to tell the truth? We might not put him on at all, right? To let the gunshot residue test speak for itself. Wow. Well, moving on, Your Honor, then. Another breakdown occurred when associate counsel elicited irrelevant gang evidence from Rogelio Marin and Jose in their direct examinations. The State, I'm sorry, the defense had filed a pre-trial motion to exclude all gang evidence for trial. And the State, for its part, did not introduce any gang evidence in its case in chief. And yet, defense counsel produced this highly prejudicial and irrelevant gang evidence through the testimony of its two witnesses. And we know why they did this. We know from the post-trial motion, and so the hearing, where lead counsel said he had properly prepared these witnesses for trial and we learned from associate counsel that associate counsel had prepared them at all for trial. And thus we had this inexplicable admission of gang evidence. But there was no evidence admitted that the defendant was in a gang. Yes, there was, Your Honor. Well, wasn't the evidence that the Rogelio, who, according to the defendant, was the person responsible for throwing the gun out the window, that he was actually in a gang and there was no evidence. There was evidence to my client. Based on my reading of the record that the defendant, Jose, was ever in a gang. It was the person throwing the gun out the window that was in the gang. Well, I think that Jose testified about the gang as well. Well, he didn't testify he was in a gang. He testified that Rogelio was in a gang. He testified about gangs, but not that he was in a gang. Right, but he was in the car with them and got out while these signs were being thrown. Correct. And furthermore, Rogelio, we have this state relying on gang evidence. In closing argument. But again, doesn't that kind of bolster the defendant's theory that I'm not in a gang? This guy who admits he had the gun, he's the one that's in the gang. And in fact, it's a gang gun. All of which came out, which went far way beyond what the motion to eliminate was. So the defendant's theory is my point based on my reading of the record. I don't think it supports the defendant's theory that they want the jury to know that they were in a gang. And that there was a gang involved. It's not that Jose's in a gang, it's the other guy's in the gang. Well, I mean, I don't know if the jury's going to make that distinction, Your Honor. Are you saying that because Jose was asked by his own attorney about gangs at all, and gang signs at all, that from that the jury could believe that he was in a gang? Well, we know that Rogelio testifies that the gun is communally owned by the gang. That he lives with the Penalosas in his house. The, I think that the, what the state was getting at, especially in rebuttal argument, was they owned this gun together, Jose, Rogelio, Penalosas, certainly. And then we also have the evidence that Rogelio has gang tattoos on. And again, I think, Your Honor, the state relied on this gang evidence to close the argument to tie Jose, all the people in the car who they claimed were out that night looking for trouble, which I think was very persuasive to the jury. These were people in a car out looking for trouble, and certainly that was prejudicial to Jose. The next breakdown occurred when the defense counsel on Jose's direct examination elicited improper hearsay identification testimony that Officer Yee identified him as the shooter. The trial court, sua sponte, struck this evidence and correctly labeled it as hearsay and invited the state to make an objection, which the court then sustained. Then on cross-examination of Jose, the state elicited this hearsay identification yet again without objection from defense counsel. The state, and then on redirect, defense counsel inexplicably elicited this hearsay identification once again. And the state, then in closing and rebuttal argument, relied on the hearsay identification to show that Jose was the shooter. Again, a breakdown in the proceedings. This was highly prejudicial identification hearsay. Well, during that same interchange, didn't Jose say, no, I'm not the shooter, I didn't shoot anybody? I don't think that that got out, Your Honor. No, it did get out. It was part of the record. Well, again, Your Honor, to have Jose providing an identification hearsay from the officer, I think is highly prejudicial. I'm not saying that it should have come in. I'm just saying didn't that kind of minimize any prejudice by his saying, well, yeah, but I didn't shoot anybody? Well, again, Your Honor, I don't think you should have had to contend with the officer identifying him. I mean, I think that was an improper, what everyone was saying, impeachment of his testimony or whatnot. But it was, again, elicited by counsel herself and then re-elicited on redirect examination, which I think, again, prejudices Jose's defense. The same can be said for the hearsay radio dispatches, which counsel did not object to during the officer's direct examination of the state's case. Having the officer testify, they received radio dispatches stating that the officers had been shot at, corroborated the officer's testimony that they had been shot at, in fact, and rebutted the defense's case that this was an accidental shooting. Again, that was a mistake on defense counsel's part. They should have objected, and it prejudiced the client. And finally, Your Honors, we have the breakdown caused by counsel's unprofessional conduct throughout the proceedings. We have counsel shouting when the officer identified Diego as the front seat passenger. The trial court had to scold counsel before the jury about not to yell in the courtroom as if he was a school-aged child. We have the prejudice when the trial court actually removed counsel from active representation in the case when counsel, again, had failed to understand that there was a positive GSR case. You said that you actually removed counsel, but counsel stayed on the case. But not actively participating. We have associate counsel. Well, that's not exactly accurate. He was there. He participated in the jury instruction conference. He made objections. But he didn't. He clearly was at counsel table. But he didn't. He did not examine Jose or Rogelio, and he didn't make a closing argument. And as we know. We don't know from the record why that happened. No, we do know. In the post-trial hearing, associate counsel said that after it became clear that counsel had blown the GSR evidence, the judge told her that she was to conduct the trial from there on out. That's what her testimony was, and that was clear by the record. She was unprepared. It was her first criminal trial. We know that from the record. And we know that she was not prepared. She did not prepare the witnesses. She was not prepared to do the examinations. And she was not prepared to close the arguments. And that is all shown. And that is all supported by the record as well. What about the fact that the judge commented on the record that there was something that he saw that would lead him to believe that her performance was deficient? Well, I think that the trial court, I mean, I think Sullivan could have missed some things. I'm sorry, say that again? I think the trial court was, I mean, to say that these lawyers were acting responsibly, I think is amazing, frankly, given this record. That he was aware of, well, whether or not he was aware that the associate counsel was, had never before represented a criminal in a criminal case. And I think that her performance showed that this was her first criminal case. But he did say the co-counsel, who ultimately took over the questioning, was okay. I mean, he did say that. Sure. He said he observed her in court and he thought her performance was okay. And she had elicited gang evidence that the defense had tried to, prior to trial, keep out. She elicited hearsay identification testimony. I mean, I think these were serious moments. Can we rewind just back to the very beginning? This is the judge, an experienced judge, who, when he realized that Mr. Adams, lead counsel, was going to try to represent all four defendants and that might cause a problem, whistled everybody in and had a dialogue with the defendant and say, you know, what are you going to do about this? And the defendant went back and talked to Mr. Adams and came back and said, no, he's going to represent me. So the defendant made this choice about Mr. Adams very early on. Now, he may not have known everything that was going to happen in his own trial, but he knew that Mr. Adams, at that point, was willing to represent four defendants, at least one of whom might not be helpful to himself, the defendant. And yet he still went ahead with Mr. Adams. So what are we supposed to take from that? Well, I think we can say that my client was ready to accept Mr. Adams, even after he blew the gunshot residue evidence, for example, or that this case was then going to be taken over by a person who had no criminal law experience in a trial and was going to allow gang evidence to be introduced. Here's the identification evidence. The defendant never testified in the hearing on the motion for the new trial that he didn't know Mr. Adams had limited experience in criminal trials or that his colleague had no trial experience. I don't know if the defendant even knew that. We don't know if the defendant knew that. I think Mr. Adams had a lot of experience in criminal trials, but I think that his qualms here was highly questioned. Okay. He was a final defense officer as well, wasn't he? That's right. And, of course, he had been charged in a case during the proceedings and the court forced him to tell my client that he had been charged in a different case. But, again, I mean, the way this case had stacked up, again and again, the breakdown, Your Honors, I think shows that. This judge is very experienced, and he's seen a lot of attorneys come and go. He's been in a lot of criminal defense prosecution cases. He knows what's going on. And he did not grant the motion for a new trial because he thought that Ms. Branska performed suitably. And he went into some detail about that. So when Mr. Adams wasn't pursuing the case directly, maybe indirectly from counsel table, I don't know, he was involved in the instructions. He did step up every once in a while and pipe up every once in a while. The judge was there, and he saw that. This isn't some brand-new judge. This is a judge that's got a lot of experience, and he saw what was going on. So you're asking us to just ignore what he saw. I'm suggesting that he was wrong about what he saw, and that there were really, as I've discussed, there were real problems with this case. There were real problems with how the defense counsel approached the case, how they comported themselves during trial. And for that reason, I'm asking this Court to reverse and remand for a new trial. That's all our questions. Thank you. Good morning. Again, Your Honors, there's no prejudice in this case. This is a case where we have two veteran police officer victim eyewitnesses who identify defendant reaches hand out of a fleeing vehicle and his profile and then his face with a larger than normal gun and aim and shoot it at them. This is a seamless transaction, if you will. We have these officers who are following this fleeing vehicle, this reckless vehicle, because it had just hit a car in the intersection. No dash cam. No body cam. Yes, Your Honor, there is not. They do, they follow, the testimony is that they follow this vehicle without interruption and they are able to witness defendant pulled from the front passenger seat and identify him right there on the scene as the person that just hit shot at them. And the car was making a sharp left turn on to hers. It was hers, yes. And the officers at that point had made a U-turn and they were a little bit behind the defendant's car. Correct. So they had the passenger doors in clear sight as it made this sharp left turn on to hers. Were they right next to the car? I couldn't see from the testimony how far away they were from the car. Your Honor. This car is making a sharp left turn. It's possible they lost sight of the passenger door for a second or two. It could be possible. There's no testimony to indicate that. There's just testimony that they were in hopper suit. They did radio dispatch so that they could share. Really, there's a dangerous vehicle on the roads here. And then we have two other officers respond and they're able to head off defendants. They didn't see the left turn. They were already on Lemoyne. Correct. Yes. So this is a SUV, presumably has windows in the front seat and the back seat on the passenger side. Yes. I would say the testimony really did show that it was a swift interaction and they had a clear view and they were able, even despite the turn, to keep their eyes on this fleeing vehicle. And as I stated, it was headed off by two other officers, so this really was a swift interaction, seamless. There's no testimony that they saw any sort of seat changing or anything. I'm not suggesting seat changing. I'm just wondering, there was not a lot of testimony about what the back, the guy in back of the passenger seat was doing. That guy had a window and that was the guy that had GSR on his hands. And there's not a whole lot of testimony about anybody saw him do anything. It's just a curiosity in this case. Certainly, and I understand that curiosity. I think it's important in this case to really focus on the prejudice prong, as this court is well aware, this type of case and ineffective assistance of counsel claim may be disposed of by going directly to that prejudice prong. And here, defendant cannot show prejudice, which would really amount to showing evidence, showing that there's a reasonable probability that but for these four alleged errors, the outcome of his case would have been different. And the outcome here is it includes two guilty verdicts for the attempt murder of a police officer. And really what we have, the reasonable probability amounts to a probability sufficient enough to undermine the confidence in the outcome. And none of defendant's arguments compromise or show any sort of undermining of the confidence in those guilty verdicts. And did you have a question? Okay, so the state's job is to get to justice, not just to convict somebody. Absolutely. Were the bullets in the pocket that the defendant had on, Jose had on, were they ever tested to see if they actually could fit in the gun that was found? So there was... Nine millimeter bullets, I know that. Correct, and there was evidence that was destroyed. And they were destroyed. They were destroyed in the process of inventory. A pocket full of bullets was destroyed. Correct, Your Honor. So we have what was recovered was this submachine gun or an Uzi, and there was a spent casing that was lodged into this cartridge, which was improperly put into the gun. So essentially or ostensibly it could have done rapid fire, but it was only able to... That's not my question. My question is, Jose was caught with a bunch of bullets in his pocket. Were those tested? And now you're telling me, oh, no, they weren't tested because this whole pocket full of bullets, number unknown, was destroyed. That did come out at trial. Correct. Was his glove tested? His glove... His sweater was, but was his glove? Your Honor, his hands were tested. I'm not sure that his glove was tested, and this was four hours later after the incident anyway. The testimony did show that. The glove was in inventory. The police were controlling, so the glove wasn't washed. The glove wasn't rubbed against anything. If there were GSR on the glove, well, the police had it under their control. They weren't going to do anything to remove the GSR. I'm just curious about your state. You're telling me the glove was not tested. I couldn't find it in the record. I just wanted to confirm the glove was not tested. It's my understanding that it was not. So we don't know if those bullets might even have fit in that gun. I think it was a 9-millimeter, but it was apparently some specific make and model of a gun, a Colbray or something like that. And I just wondered. Sure. But I'm also curious about how a pocket full of bullets could all be destroyed in the testing. Your Honor, I do not have the answer to that. It would be all speculation on my part. What I can sort of redirect the Court back to is these two police officers, I believe Officer Yee had been on for 10 years, Officer Theodore, he's for 14. They witnessed this. They saw a defendant's profile. They saw his tattoo. They saw him lean out with this gun and shoot at them. If I could address the allegations of ineffective assistance of counsel, just one by one, I'd like to point out where each of them do not show any prejudice. Regarding the gunshot residue here, so as Justice Coghlan pointed out, it's really inconceivable how the gunshot residue from co-defendant Diego Penaloza, any testimony showing that that was positive or showed the positive particles, would have helped defendant's theory, which was wrong place, wrong time. I'm in this car with two of my brothers and my buddy, co-offender Rogelio Marin, but I didn't shoot the gun. In fact, it was Rogelio Marin who did, and he is a rear passenger. He testified on behalf of defendant, stating defendant had nothing to do with the gun. It was all me. It was a communal gun. We were in the car, but it was all me. So, again, it's really sort of irrelevant to his defense. It may have even muddied the waters where he is pinning it on his buddy, Rogelio. And it's important to point out that Defense Counsel Barganska does elicit the most telling, if there is any testimony, from Ms. Wong, the forensic scientist, which was that defendant did not show the necessary particles for a positive test for GSR. This was hardly, hardly exculpatory evidence here, where it didn't corroborate defendant's defense theory, which was not me. It was co-offender Rogelio Marin. And just on this point, Your Honors, defendant does make a point about Defense Counsel Wayne Adams being removed from the trial during a sidebar on this issue, the GSR issue. There is nothing in the record to show that he was, in fact, removed from the trial. All we have is the motion for new trial is Defense Counsel Barganska stating that that's what occurred. But I want to point out that during the State's case in chief, Defense Counsel Barganska, she did the cross-examination of Officer DeLeon. She did the cross-examination of Officer Valdez. So she certainly wasn't irrelevant up to this point. She herself admitted that she worked for Defense Counsel Adams for eight years as a law clerk, two years as a licensed attorney. She was very much immersed in this case. She testified that she was present for an interview with defendant before he testified, that she worked up the files. So aside from the fact that there's really no evidence that Defense Counsel was removed, in fact, I would say that the record actually refutes that by the fact, and again it was brought out by this court, that Defense Counsel Adams very much did sort of rear his head when he made some sort of objection during the closing argument, the State's closing argument, and when he was involved in the jury instruction conference. I believe Judge Ford specifically asked Defense Counsel Adams if he was okay with the post-trial date for the PSI. So this was certainly not someone who was called off the case, if you will, or asked to withdraw from the case. It's clear that he remained on and that he sat with Co-Counsel Barganska. Secondly, Your Honors, the gang signing issue, there was no prejudice with regards to this issue. And that's really, again, defendant was using this gang signing scenario in his favor, really to sort of bolster his defense. And that was, I was with the wrong people at the wrong time, and it was in fact co-offender Rogelio Marin who was doing much of this gang signing, and it was mutual. That was, that really was their narrative, that they ran into another car, and there was mutual gang signing, which is what instigated the chase with co-defendant Marco Penaloza, defendant's brother, then chasing that car, and then it culminates with the car accident, and we go into the police chase here. So I think defendant, defense counsel's sort of eliciting this gang signing scenario was setting the landscape for how defendant was just sort of immersed in this bad situation, but really it had nothing to do with him or the fact that he may have been a gang member. It was all Rogelio. Thirdly, your honors, with regards to the hearsay allegations, one, the dispatches here were certainly not hearsay. They were not offered for the truth of the matter asserted. They were certainly shared so that, I believe it was just a shots fired, and then there was a license plate. There was no description of the shooter, nothing that went to the heart of this is the person who shot at us. We had a vehicle that was fleeing a shooting, so this was very much necessary to share with fellow officers for the safety of our city, if you will, and to really stop this criminal spree that they were on. So the dispatches here certainly do not qualify as hearsay. They were really part of the police investigatory exception. With regards to defendant's testimony that he was pulled out of the front passenger seat and they said I was the shooter, again, defendant created this narrative so that he could set up the story that he was sort of framed, that then he told them he wasn't the shooter. So again, this would not qualify as hearsay when defendant is testifying on his own behalf and sharing this. I think lastly, defendant's overall allegation of unprofessional conduct with regards to defense counsels Wayne Adams and Christina Varganska. I think the trial court, Judge Ford, in the post-trial ruling at the motion for new trial, I think that he really emphasized that there was no prejudice here and certainly admitted that he had to admonish and chastise defense counsels or correct them. But at the end of the day, any errors during argument were certainly cured and I think that the jury was certainly admonished again that arguments were not evidence and so they were aware of that. I think with regards to defense counsel Adams, there's really a lot in the record to show that he was overzealous but certainly didn't show that it was imperfect. I mean, for one defense counsel it may be brilliant artwork whereas another defense counsel would sort of shy away at those sort of antics. But as this court knows, the strategy of one defense counsel is really virtually unchallengeable. So that's really a high threshold here. I do urge this court to focus on the prejudice factor but just to point out with the first prong here, as a very important aside, I think many of the complaints here could arguably be strategy. And while it may not have been perfect strategy or strategy that one would employ, that we would employ, it really did not rise to the level of being objectively unreasonable. So I would just, again, urge this court to look back to the facts of this case and the fact that we have two credible eyewitness victims who immediately identified defendant as he was removed from that car. They identified him unequivocally at trial and there was simply no prejudice that defendant endured as a result of his defense counsels. If there are no further questions, the state would just rely on the rest of its arguments in its brief. Thank you very much. Thank you. Your Honor, I just want to go back to the gang evidence for a moment. And the record is clear that Jose testified that he got out of the car with Rogelio and they both made gang signs. And I think clearly the jury is going to infer he is in the gang. Jose went on to testify about gang relations between Latin and African American gangs. There's a plethora of evidence showing that the jury would have considered him to be in a gang. And again, when the defense filed a pretrial motion to exclude all of this evidence, and the state did not present any gang evidence in this case in chief, it's inexplicable why defense counsel would not have told Jose and Rogelio, do not mention anything about gangs, do not mention exchanging gang signs between you and the other car, and certainly don't mention that you have gang tattoos on your chest and abdomen and don't make a gang sign in front of the jury and don't have the judge make a gang sign in front of the jury. The gang evidence in this case was... As far as the judge goes, I think that it's important to note that the judge is simply stating for the record what the witness has done, which any judge does. And he asks, am I doing this right, Your Honor, to make a gang sign? He's demonstrating for the record what the witness has done. And when gang evidence is irrelevant... And I suggest that that's inappropriate. When gang evidence is irrelevant, as it was in this case, for it to reach the jury is reversible error. Well, wait. The judge had authorized them to use the gang signing part of this. Yes. I would expect that. And that's really what they were talking about was the gang signing. So the judge said that was okay. Yes. They didn't introduce that at all. Now, again, my argument is defense counsel should have instructed the witnesses not to mention anything about gangs in their testimonies. They could have simply testified they were driving, they struck this car, and then the police chase occurred from then on out. The jury did not need to know about gangs. The jury should not have heard about gangs. And the state should have been able to rely on this gang evidence in closing our... in rebuttal our argument. Again, for these reasons, Your Honor, I ask that you reverse Jose's conviction and demand a free trial. Okay. We'll thank both parties and the counsel involved for the arguments and briefs, and we'll take the matter under advisement and issue an opinion forthwith without spilling the water. We're adjourned.